IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY,<br><br>    Plaintiff and Counter-Defendant,<br><br>    vs.<br><br><br>OMG AMERICAS, INC.,<br><br>    Defendant and Counterclaimant. | ORDER<br><br>AND MEMORANDUM DECISION<br><br><br>Case No. 2:10-CV-1027-TC |

## INTRODUCTION

This title insurance coverage dispute comes before the court on OMG Americas, Inc.'s

Motion for Partial[1] Summary Judgment and Commonwealth Land Title Insurance Company's

Motion for Summary Judgment.  For the reasons set forth below, OMG's motion is GRANTED

and Commonwealth's motion is DENIED.

## FACTUAL BACKGROUND[2]

### The Lease

Commonwealth Land Title Insurance Company (Commonwealth) issued a $3 million title

insurance policy on September 28, 1995, to OMG Americas, Inc. (formerly OMG Apex).  The

title insurance covered a 25-year lease (with a 25-year renewal option) entered into by OMG and

---

[1]OMG refers to its motion as one for "partial summary judgment" because the case has been bifurcated into a liability phase and a damages phase.

[2]The facts are not disputed.

the Shivwits Paiute Band on September 25, 1995.  The Lease allowed OMG to use the Shivwits

Band's land to process mined ores, mineral concentrates, metal byproducts, and "other metal-

containing feedstocks"; to store the feedstocks on site; and to generate and process hazardous

waste.  (See Aug. 10, 2000 Bureau of Indian Affairs Letter to OMG (Ex. H to OMG's Mem.

Supp. Mot. Partial Summ. J.) at 2-3 (summarizing the terms of the Lease).)

Because the leased land was held in trust for the Shivwits by the Bureau of Indian Affairs

(BIA), BIA approval of the Lease was required.  On September 25, 1995, a BIA field

representative provided the approval.

According to OMG, between 1995 and 1999 it invested more than $31 million in

upgrading the facility in reliance on its leasehold interest in the property.

**Voiding of the Lease**

In August 2000, the BIA declared the lease void *ab initio* for two distinct reasons: (1) the

BIA field representative did not have the necessary authority to approve the Lease and so the

Lease was completely "void for lack of approval by a properly-delegated BIA official"; and

(2) OMG failed to "properly comply with the requirements of NEPA[3] at the time the Lease was

entered into."  (Aug. 10, 2000 BIA Letter to OMG Apex ("BIA Decision") at 1.)  According to

the BIA,

> [w]hen the [twenty-five year] Lease was approved in 1995 . . . the Field
> Representative had only 10-year approval authority with respect to business
> leases.  In addition, OMG has essentially acknowledged that it failed to comply
> with NEPA at the time the Lease was entered into, through its acquiescence to the
> Field Office's demands over the last year for a "supplemental" [environmental
> assessment under NEPA].

---

[3]NEPA stands for National Environmental Policy Act.

(BIA Decision at 3.)

To support its decision, the BIA cited to the Interior Board of Indian Appeals (IBIA) decision in Scott v. Acting Albuquerque Area Director, 29 IBIA 61 (1996), which was particularly on point.  In Scott, the IBIA upheld a BIA decision to void the entire term of a 25-year lease of tribal lands, including the 25-year renewal option, because the BIA agent who approved the lease did not have the sufficient authority to approve the full lease term.  In Scott, the BIA also found that the lease was "invalid for failure to comply with NEPA[.]" (BIA Decision at 1.)  To OMG, the BIA stated:

> In applying the Scott decision to the facts of this case, we find that: (1) the manner in which the approving official's authority was exceeded is much greater in this case, in that the Field Representative's delegation covered a shorter period and the "excess" did not involve an option period which could arguably be "severed"; (2) the failure to comply with NEPA was more egregious in this case, in that nearly 100 additional acres (not covered by the 1984 [Environmental Assessment]) were affected and the change in use posed a much more serious threat to the physical environment; and (3) the potential harm to the economic well-being of the tribal landowner is much greater in this case, in that the Band is clearly not receiving a "fair annual rental," while at the same time it is not adequately secured against the threat of contamination or the cost of remediation.

(BIA Decision at 3.)  Nevertheless, after declaring the Lease void, the BIA told OMG that the Shivwits Band was "willing to enter into an interim agreement to allow OMG to continue its operations, while pursuing a new long-term lease (which could be made retroactive to the date on which the Lease was erroneously approved in 1995)."  (Id. (emphasis added).)  Such an arrangement was contingent on OMG immediately paying $250,000 to the Shivwits Band ("to obtain technical assistance in the negotiation of the new lease, the review of environmental documents, and coordination with various regulatory agencies"), posting a $10 million

reclamation bond, and delivering documents necessary to complete the new lease negotiations.

(Id.)

The BIA reminded OMG that, as a matter of law, OMG could not pursue equitable

defenses against the government.  It then said "it seems clear that basic due diligence would have

revealed that the delegation documents cited in the 1995 approval certificate were insufficient to

support the Field Representative's action, and that OMG knowingly assumed the risk of

proceeding under the new Lease without any additional NEPA documentation."  (Id.)

OMG timely appealed the BIA Decision to the Interior Board of Indian Appeals (IBIA).

It also entered into lease negotiations with the Shivwits Band.

### OMG's Title Insurance Claim

In September 2000, soon after filing the appeal, OMG submitted proof of loss to

Commonwealth, who, in June 2001, agreed to defend OMG in the administrative appeal on the

lack of authority issue.  Commonwealth, however, reserved its decision on whether it had an

obligation to indemnify OMG for losses sustained when the BIA voided the Lease for lack of

authority.  As for the NEPA compliance issue, Commonwealth stated that the Policy's Exclusion

1(a) barred coverage and so Commonwealth did not have a duty to defend or a duty to indemnify.

In its letter to OMG, Commonwealth stated:

> The BIA asserts two bases for the alleged invalidity of the lease: (a) lack of
> authority on the part of the Field Representative who approved the Lease
> Agreement and/or (b) non-compliance with NEPA at the time the Lease
> Agreement was entered into. [Commonwealth] hereby confirms its acceptance of
> coverage for the claim associated with the authority of the Field Representative.
> As to the second basis for invalidity, NEPA is a federal law relating to
> environmental protection.  Loss arising from noncompliance with or violation of
> such a law is expressly excluded from coverage under Exclusion from Coverage
> 1(a) except to the extent that ". . . notice of the enforcement thereof or notice of a

4

> defect, lien or encumbrance resulting from a violation or alleged violation
> affecting the land has been recorded in the public records at Date of Policy." . . .
> [Commonwealth] is not aware of any notice having been recorded at Date of
> Policy in the public records of Washington County, Utah, which might fall within
> the exception contained in Exclusion from Coverage 1(a).

(June 1, 2001 Letter from Commonwealth to OMG (Ex. M to OMG's Mem. Supp. Mot. Partial

Summ. J.) at 4.)  In December 2001, OMG confirmed Commonwealth's decision to provide half

of the defense costs.  In the letter, OMG's counsel reiterated that, "in accepting this offer OMG

reserves its right to seek indemnification for losses it may suffer as a result of the BIA decision."

(Dec. 18, 2001 Letter from OMG to Commonwealth (Ex. N to OMG's Mem. Supp. Mot. Partial

Summ. J.).)

**OMG's Appeal and Negotiations**

During the appeal, OMG entered into settlement negotiations with the BIA and the

Shivwits in an attempt to get the original Lease (i.e., title) reinstated or to continue mining

operations under a new lease.  Over time, OMG reasonably determined that it had no realistic

chance of getting the original Lease reinstated (i.e., it determined that its legal position on appeal

was unsupportable given dispositive case law supporting the BIA's position).  According to

OMG, it only settled "when it became apparent there was no viable defense to the BIA's 'lack of

authority' argument."  (OMG's First Supplemental Brief (Docket No. 48) at 11.)  In its briefs, it

describes its weak litigation stance:

> In its letter voiding the Lease, the BIA cited the IBIA's decision in Scott v.
> Acting Albuquerque Area Director, 29 IBIA 61 (1996), as precedent for its
> authority to void a lease issued with inadequate approval authority.  Just like this
> case, Scott involved an Indian lease where the Superintendent lacked the
> delegated authority to approve a 25-year lease with a 25-year extension.  The court
> deemed it an "ultra vires" act and held that "unauthorized acts of BIA employees
> cannot serve as the basis for conferring rights not authorized by law."  Scott, 29

IBIA at 69 (citations omitted).

> OMG's only arguments on the "lack of authority" defect were ratification, laches, and estoppel against the federal government. Once briefed, it was clear those arguments were tenuous at best.  Only one case – <u>Rosebud Sioux Tribe v. Grover</u>, 104 F. Supp. 2d 1194 (D.S.D. 2000) – supported OMG's theory. Unfortunately, even that case was overturned during the pendency of OMG's appeal, leaving OMG with no viable argument against the "lack of authority" defect.

(<u>Id.</u> at 11-12 (footnotes omitted).)[4]

OMG eventually ended lease negotiations because the proposed lease offered a term of twenty-five years (as opposed to the fifty year term in the original Lease) and contained substantially more expensive and restrictive terms.[5]  Citing financial concerns and a no-win legal position, OMG pulled out of the project and left the property.  At the same time, OMG settled legal the dispute with the BIA, and the IBIA dismissed the appeal based on the parties' stipulation.  The BIA ruling that the Lease was void *ab initio* remained in place.

**Communications Between OMG and Commonwealth**

During the appeal, OMG communicated with Commonwealth by providing periodic status reports, copies of pleadings, and billing statements.  As noted above, OMG informed Commonwealth about the IBIA appeal.  On January 25, 2001, OMG sent Commonwealth copies

---

[4]<u>Compare</u> Ex. G to First Supplemental Br. at 17-23 (OMG's argument was based almost entirely on equitable considerations; OMG admitted that such arguments are applied sparingly against the government) <u>to</u> Ex. GG to First Supplemental Br. at 25-38 (BIA brief citing compelling precedent in response to OMG's equitable defenses and identifying on-point decisions endorsing the BIA's right to void action taken without adequate authority).

[5]For example, the original Lease required OMG to pay annual rent ranging from $31,300 to $41,688, plus $5,000 per year for water rights.  After the BIA declared the original lease void, the Shivwits Band and OMG were discussing an increased annual rent payment ranging from approximately $143,000 to $215,000.  (<u>See</u> Ex. 11 attached to Kindinger Decl. (Docket No. 34).)

of briefs filed by parties to the appeal.  (See Ex. O to OMG's Mem. Supp.)  As OMG noted,

"[t]hose briefs amplified [the fact that] OMG had no prospect of winning on the 'lack of

authority' issue."  (OMG's First Supplemental Br. (Docket No. 48) at 12.)  On April 4, 2001,

OMG sent a copy of a Stipulated Motion for Stay and an Order Granting Stipulated Motion for

Stay, "staying all proceedings until January 3, 2002.  The parties to the proceeding requested this

Stay so they could continue negotiations toward a settlement of the Loss, such settlement being

in the form of a new lease."  (Apr. 4, 2001 Letter from OMG to Commonwealth (Ex. P to OMG

Mem. Supp.).)  The settlement negotiations apparently continued for some time and the matter

remained stayed.

        In January 2002, Commonwealth confirmed the parties' agreement about splitting

defense costs

> in connection with the [IBIA] appeal and related settlement negotiations in full
> settlement of all claims for defense costs made under the policy for this claim. . . .
> The settlement is without prejudice to OMG to seek indemnification for losses
> insured under the [Policy].  Should OMG make any claim for indemnification,
> Commonwealth expects it will do so consistent with the policy provisions
> including submission of necessary proofs of insured losses.
>
>         We understand that an agreement in principle has been reached between
> OMG and the Shivwits Indians which will be embodied in a new lease.  You
> anticipate lease discussions will be concluded and a final agreement reached
> consistent with the agreement in principle within the next 60-90 days.  Thereafter,
> final BIA approval is expected in the Fall after the BIA approves OMG's
> requirements pertaining to NEPA issues.

(Jan. 3, 2002 Letter from Commonwealth to OMG (Ex. EEE to OMG's Opp'n to

Commonwealth's Mot. Summ. J.) at 1 (emphasis added).)

        The record does not reflect what communications occurred between the January 2002

letter and July 2005 (when another update was sent), but OMG submitted requests for payment of

attorneys' fees, and Commonwealth reimbursed OMG upon review of the billing statements.

(See Exs. S, L, & W to OMG's Mem. Supp.)

Communications in the summer of 2005 shows that Commonwealth knew that OMG was

working with BIA and the Shivwits on an exit plan.  On July 11, 2005, OMG sent an update to

Commonwealth, in which it stated that

> OMG, BIA and Shivwits Band filed a Joint Status Report and Continued Motion
> to Stay on February 24, 2005, asking the IBIA to continue the stay through the
> balance of the year to provide OMG with a legal right to remain on the premises
> while it completes its removal activities.

(July 11, 2005 Letter to Commonwealth from OMG (Ex. S to OMG's Mem. Supp.) at 1

(emphasis added).)  Commonwealth sent a response letter to OMG enclosing payment for

attorneys' fees and stating:

> We also reconfirm our earlier request to provide a short status statement of this
> matter and the insured's intent regarding it.  We understand generally that the
> insured **expects to dismiss the appeal** at the end of the year, **that it has made a
> decision to vacate the subject premises** and is in the process of negotiating
> remediation or contamination agreements with the Tribe.  We do want more
> information though regarding the present status, the insured's plans and expected
> time table.  We also ask again to be kept regularly apprised of this matter as it
> goes forward.

(Aug. 24, 2005 Letter from Commonwealth to OMG (Ex. W to OMG's Mem. Supp.) at 2

(emphases added).)  OMG points to this August 2005 Letter as evidence of Commonwealth's

written consent to the settlement agreement under which OMG agreed to "vacate" the land and

discontinue leasing from the Shivwits.

In October 2005, in a subsequent status report, OMG provided the following update to

Commonwealth:

> We are currently negotiating the terms of facility shutdown and termination of the

8

lease . . . .  We are also preparing a draft <u>exit agreement to ensure that OMG will</u> <u>face no contractual or other liability after departing the site</u>.  While we are hoping to be <u>off the property by the end of the year</u>, if we are unable to meet this goal, we may have to ask the court for one more short continuance of the stay.  <u>OMG's</u> <u>ultimate objective is to file a stipulation with the BIA and Shivwits band,</u> <u>dismissing the appeal and releasing OMG from all related future claims</u>.

(Oct. 27, 2005 Letter from OMG to Commonwealth (Ex. Z to OMG's Mem. Supp.) at 1

(emphasis added).)

After the case was settled and dismissed in September 2006, OMG sent another letter to

Commonwealth:

On behalf of OM Group, I wanted to <u>follow up on our recent discussion regarding</u> <u>the final resolution of the OMG lease appeal</u>.  <u>As we discussed</u>, on September 5, 2006, OMG and the Shivwits Band entered into a Final Settlement Agreement <u>mutually releasing OMG and the Band from existing and future claims pertaining</u> <u>to the Lease or the Site</u>.  <u>I have enclosed an executed copy for your reference</u>. OMG and the BIA subsequently filed a Stipulation for Dismissal with Prejudice on September 9, 2006, which was granted by the Court on September 14, 2006 (copies enclosed).  <u>This dismissal represents a full and final resolution of the</u> <u>dispute</u> between OMG, the BIA and the Band in [the IBIA appeal].

(March 9, 2007 Letter from OMG to Commonwealth (Ex. T to OMG's Mem. Supp.) at 1

(emphasis added).)  After OMG forwarded the September 2006 Stipulation for Dismissal with

Prejudice and Final Settlement Agreement to Commonwealth in that letter, OMG submitted its

final defense cost bills to Commonwealth.  Commonwealth paid those bills on April 17, 2007.

(See Ex. X to OMG's Mem. Supp.)

On October 1, 2007, OMG reiterated to Commonwealth the series of events that led to

the settlement.  It noted that OMG and Commonwealth held "interim discussions" regarding the

negotiations and settlement.  (Oct. 1, 2007 Letter from OMG to Commonwealth (Ex. EE to

OMG's Mem. Supp.) at 2.)  The timing and content of those "interim discussions" is not

reflected in the record.

There is no evidence that Commonwealth objected to the intent and progression of settlement negotiations, including the switch from negotiating a new lease to an agreement to end operations at the site and leave the property.

After the appeal was dismissed, OMG filed a claim for indemnification from Commonwealth.

> Now that defense of the BIA's claim against OMG is complete, it is time to turn to [Commonwealth's] obligation to indemnify OMG under the Policy for the losses resulting from that claim. As projected in OMG's September 7, 2000 proof of loss, the damages caused by BIA's determination that the insured leasehold interest was "void" are very significant, and exceed the Policy's $3,000,000 limit many times over.  Such damages include (without limitation) lost property rights, required departure costs due to the lack of an ownership interest, lost investment in buildings and other appurtenances, devaluation of OMG's assets and business and lost profits.

(Oct. 2, 2007 Letter from OMG to Commonwealth (Ex. EE to OMG's Mem. Supp.) at 2.)

In 2010, Commonwealth filed this action seeking a declaration that the circumstances surrounding OMG's claim and litigation of the administrative appeal preclude any indemnity obligation under the Policy.  OMG counterclaimed, seeking a declaration that Commonwealth has a duty to indemnify OMG for losses and that Commonwealth breached the insurance contract by refusing to cover OMG's losses.

In December 2011, the parties filed cross motions for summary judgment.  The court had an initial hearing on the motions on February 9, 2012.  At the close of that hearing, the court took the two motions under advisement and ordered supplemental briefing on two issues: (1) to what extent did the NEPA violation cited by the Bureau of Indian Affairs guide the BIA's decision to void the Lease and, relatedly, how does that fit into the Policy exclusions?; and (2) did

Commonwealth expressly or impliedly consent to the settlement and dismissal of the IBIA

appeal?  The court held a second hearing on August 29, 2012, to clarify remaining issues.  It now

issues its order.

## ANALYSIS

The court must first determine whether the claimed loss was covered by the Policy.

Then, if the answer is "yes," the court must determine whether any exclusion bars coverage.

The insured has the burden of proving that its claim falls within the policy's coverage.

All the insured needs to do "is bring himself within the field therein defined" by the policy.  LDS

Hosp. v. Capitol Life Ins. Co., 765 P.2d 857, 859 (Utah 1988).  Once the insured has brought

itself within the policy's coverage, the burden shifts to the insurer to establish that coverage is

barred by one of the policy's exclusions.

> "[A]ny exceptions or conditions which would then deny him relief, take him out
> of the indemnity provisions, render them inoperative as to him, are matters of
> defense, and the burden thereof rests upon the insurer. . . .  [L]imitations,
> exceptions or conditions which may relieve the insurer from liability, which may
> be set forth in the policy outside of the language of the insuring clause, or which
> may exist outside of the policy entirely, must be made and established by the
> insurer to escape liability thereunder."

Id. (quoting Browning v. Equitable Life Assurance Soc'y, 80 P.2d 348 (Utah 1938)).

Interpreting a title insurance policy exclusion is a question of law for the court.  Valley

Bank & Trust Co. v. U.S. Life Title Ins. Co. of Dallas, 776 P.2d 933, 935 (Utah Ct. App. 1989).

As with all insurance policies, the court must construe uncertainties and ambiguities in favor of

the insured.  United States Fid. & Guar. Co. v. Sandt, 854 P.2d 519, 523 (Utah 1993); Zions First

Nat'l Bank, N.A. v. Nat'l Am. Title Ins. Co., 749 P.2d 651, 654 (Utah 1988).

A.    **OMG's Loss**

The Policy provides coverage for "loss or damage" "sustained or incurred by the insured

by reason of":

1.    Title to the estate or interest described in Schedule A being vested other
       than as stated therein;[6]
2.    Any defect or lien or encumbrance on the title;
3.    Unmarketability of title; or
4.    Lack of a right of access to and from the land.

(Policy at 1.)  OMG relies on the first and second bases for coverage.

The BIA's voiding of the Lease based on "lack of authority" created a title defect.  OMG

correctly emphasizes that the "core purpose of the insurance contract at issue [was] indemnifying

against losses due to title defects."  (OMG's Mem. Supp. Mot. Partial Summ. J. (Docket No. 30)

at 2.)  The court agrees with OMG's contention that the "BIA's determination that OMG's Lease

was completely void [meant that] title never 'vested in OMG Apex,'" the result of which was

"the most basic title 'defect' imaginable."  (Id.)  As a result of that title defect, OMG suffered a

financial loss, which falls within the Policy's coverage.

In response, Commonwealth asserts that it has no obligation to indemnify OMG because

(1) OMG's claim is time-barred by the statute of limitations; and (2) various exclusions and

conditions in the Policy bar recovery.[7]

_____

[6]Schedule A states that "Title to the estate or interest in land is vested in OMG APEX,
Inc."

[7]Much of what Commonwealth discusses in its supplemental briefs—i.e., the
environmental contamination problems at the mining facility and the related enforcement actions
by the EPA—is not relevant.  BIA did not cite to RCRA in its letter voiding the lease.
Commonwealth's attempt to tie the BIA's voiding of the lease to the environmental problems on
the land is speculative.  Accordingly, that portion of Commonwealth's argument is not
considered here.

B.      **Statute of Limitations**

Commonwealth contends that OMG's claim is barred by the three-year statute of

limitations set forth in Utah Code Ann. § 31A-21-313(1), which provides that "[a]n action on a

written policy or contract of first party insurance shall be commenced within three years <u>after the</u>

<u>inception of the loss</u>."  (emphasis added).  Commonwealth maintains that the date the BIA

declared the Lease void (August 10, 2000) was the "inception of the loss."

Commonwealth's statute of limitations argument fails as a matter of law and fact.  The

term "inception of loss" refers not to the insured loss but to the time when the insurance company

refuses to indemnify.  <u>Tucker v. State Farm Mut. Auto. Ins. Co.</u>, 53 P.3d 947, 952 (Utah 2002);

<u>Lang v. Aetna Life Ins. Co.</u>, 196 F.3d 1102, 1105 (10th Cir. 1999).  Here, the "inception of loss"

occurred on the date that Commonwealth filed its declaratory judgment action.  There is

undisputed evidence that until Commonwealth filed this action, the insurance company was still

considering whether it had the obligation to indemnify.  (<u>See</u> OMG's Mem. Opp'n Pl.'s Mot.

Summ. J. (Docket No. 37) ("OMG Opp'n Mem.") at 10-12.)  Accordingly, the statute of

limitations is not a valid basis for denying recovery to OMG.

C.      **The Exclusions Do Not Bar Coverage.**

Commonwealth contends that certain Exclusions and "Conditions and Stipulations" in the

Policy bar OMG's recovery for its claimed loss.  Specifically, Commonwealth cites to

Exclusions 1(a) and 1(b), and Conditions 2, 9(a), 9(b), and 9(c).[8]  For the reasons set forth below,

---

[8]Commonwealth also cites to Exclusions 3(a), 3(d), and Schedule B.  Because those were
not raised by Commonwealth in its original motion for summary judgment and because they fall
outside the scope of the limited supplemental briefing ordered by the court, the court will not
consider them.  Even if the court considered them, those exclusions do not bar recovery here for

the court finds that the lack-of-authority cause of the loss is covered by the Policy, and that Commonwealth has not met its burden of demonstrating that any of the cited exclusions bar coverage. Accordingly, the court holds that Commonwealth must indemnify OMG for the covered loss.

**Condition 2**

According to Commonwealth, OMG has no insurable interest because it voluntarily abandoned the leasehold when it stipulated to termination of the lease during litigation and settlement with the BIA and the Shivwits. This argument relies on Condition 2 of the Policy, which states in relevant part as follows:

> CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE. The coverage of this policy **shall continue in force** as of Date of Policy in favor of an insured **only so long as the insured retains an estate or interest in the land** . . . . This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

Condition 2 limits coverage for the insured only for as long as the insured holds title in the property. Commonwealth contends that because OMG chose not to lease the land from the Shivwits under new terms (after the original Lease was voided), its termination of the Lease meant that OMG has no insurable interest.

This argument is not persuasive. As OMG points out, "[t]hat interpretation contradicts the core purpose of title insurance because it would make the most serious category of title insurance claims (those involving total loss of title) self-invalidating." (OMG Opp'n Mem. at 2.)

---

the reasons set forth in OMG's Second Supplemental Brief. (See OMG's Response to Commonwealth's Supplemental Brief (Docket No. 53) at 14-18.)

OMG's argument that Condition 2 limits coverage only for voluntary conveyances is the appropriate reading of the Policy.

**Exclusion 1(b)**

Commonwealth, citing Exclusion 1(b) of the Policy, contends that the BIA's declaration that the Lease was void *ab initio* was an exercise of government police power.  Under Exclusion 1(b), the Policy provides that

> [t]he following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees, or expenses which arise by reason of . . . [a]ny governmental police power not excluded by [Exclusion 1(a)], except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

OMG persuasively contends that the BIA's invalidation of the Lease was based on procedural defects and not an exercise of police power. (See OMG's Reply Supp. Mot. Partial Summ. J. (Docket No. 42) at 7-8.)  The two grounds cited by the BIA are procedural defects. The lack of authority issue does not invoke concerns about the typical interests that police power exists to protect (e.g., the public's security, health, welfare).  And NEPA is a purely procedural statute that only imposes procedural requirements on governmental agencies.[9]

**Condition 9(a)**

Commonwealth relies on Condition 9(a) of the Policy to argue that OMG's rejection of the new lease offer released Commonwealth's indemnification obligation because it would have

---

[9]OMG argues (as it did in the IBIA appeal) that the BIA's reliance on the NEPA compliance is an invalid basis for voiding the lease because the duty to comply with NEPA falls on the shoulders of the agency, not the regulated party.  The court need not reach that issue.

established title or removed the alleged defect.  Condition 9(a) provides that:

> [i]f the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

Condition 9(a) does not apply here because the IBIA appeal and settlement agreement did not reinstate the original title.  Condition 9(a) covers a situation in which the insured or insurance company successfully defends against a title defect by establishing the original title.  Here, the BIA's determination—that the Lease was void *ab initio*—never changed.  And the settlement negotiations with the BIA and the Shivwits were meant, in part, to establish a <u>new</u> lease with more costly and restrictive provisions than the original Lease.  (Tellingly, a new lease would have required new title insurance.)  Accordingly, Commonwealth's reliance on Condition 9(a) is misplaced.

**Exclusion 1(a)[10]**

Under the plain language of Exclusion 1(a), a loss caused by an unrecorded violation of an environmental law is excluded from coverage.  Exclusion 1(a) reads as follows:

> [a]ny law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, **regulating**, prohibiting **or relating to** . . . (iv) **environmental protection, or the affect [*sic*] of any violation of these laws**, ordinances or governmental regulations, **except** to the extent that a notice of the enforcement thereof or a notice of a defect, lien or

---

[10]OMG objects to Commonwealth's reliance on Exclusion 1(a), contending that Commonwealth did not bring that argument in its original motion for summary judgment and so the court should not consider it.  But 1(a) is relevant to the NEPA issue the court asked the parties to brief after the initial hearing.  Accordingly, it was proper for Commonwealth to cite to Exclusion 1(a).

encumbrance resulting from a violation or alleged violation affecting the land has been **recorded in the public records at Date of Policy**.

(Policy Exclusion 1(a) (emphasis added).)

Commonwealth contends that this exclusion bars recovery because the failure to comply with NEPA—BIA's second stated reason for voiding the Lease—was a violation of environmental laws and was the predominant cause of the loss. The court disagrees. Although the NEPA violation (and this court assumes one occurred without deciding the issue) was an independent basis for voiding the Lease and falls within Exclusion 1(a), the lack-of-authority issue was an equally independent basis for voiding the Lease and that peril is covered by the Policy.

Under the insurance doctrine of "independent concurrent causation," the lack-of-authority ruling by the BIA is an independent basis for coverage despite the applicability of Exclusion 1(a) to the NEPA violation.

> For [the] independent concurrent cause rule to apply, so that insured risk prevails over the excluded risk where there are multiple causes for a loss, some of which are insured and others of which are excluded, the covered cause must provide the basis for a cause of action in and of itself and must not require the occurrence of the excluded risk to make it actionable.

Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 101:49 n.1 (2006 & Supp. 2012) (citing American Family Mut. Ins. Co. v. Schmitz, 793 N.W.2d 111, 118 (Wis. Ct. App. 2010)). See also, e.g., New London County Mut. Ins. Co. v. Nantes, 36 A.3d 224, 234 n.13, 237 (Conn. 2012) (defining "independent concurrent cause" rule); Estate of Jones ex rel. Demet v. Smith, 768 N.W.2d 245, 247-250 (Wis. Ct. App. 2009) (applying "independent concurrent cause" rule).

A cause of loss is independent if it "(1) provides a basis for a cause of action in and of

itself *and* (2) does not require the occurrence of the excluded risk to make it actionable." U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr., 716 N.E.2d 1201, 1206 (Ohio Ct. App. 1998) (emphasis in original).  Commonwealth argues that the environmental issues cited by the BIA were the predominant cause of the loss.  The court need not reach that issue, because the lack-of-authority cause fits the definition of an independent cause.  As discussed above, the BIA's legal position on the lack-of-authority ruling was very strong.  By itself, that reason was enough to void the Lease.  The BIA did not need to cite to NEPA to void the Lease.

Because the lack-of-authority basis for voiding the lease was an independent cause, the loss is covered despite the application of Exclusion 1(a) to the BIA's second reason for voiding the lease—the NEPA violation.[11]

**Conditions 9(b) and 9(c)**

Commonwealth relies on Conditions 9(b) and 9(c) to argue that OMG may not recover under the Policy because OMG's voluntary,[12] unilateral dismissal of the IBIA appeal was without written consent from Commonwealth and there was no final determination on the merits by a court of competent jurisdiction.  The court must determine whether OMG is barred from recovery either for its failure to continue the appeal to obtain a final determination by the IBIA or

---

[11]It is possible to add an "anti-concurrent causation clause" to a policy to neutralize the concurrent cause rule.  See, e.g., American Family Mut. Ins., 793 N.W.2d at 118; Driscoll v. Providence Mut. Fire Ins. Co., 867 N.E.2d 806, 810-11 (Mass. Ct. App. 2007).  But the Policy does not contain such a clause.

[12]OMG contends that the weakness of its claim resulted in a settlement that was not voluntary.  That is, OMG says it had no choice.  This contention is not persuasive because OMG affirmatively negotiated a settlement of litigation that it could have seen through to the end.  It was not forced to settle.  While settlement may have been a pragmatic legal and business decision for OMG, it was still voluntary.

for its alleged failure to obtain written consent from Commonwealth before settling the appeal.

Conditions 9(b) and 9(c) are mutually exclusive provisions.  One addresses the rights of Commonwealth in the event the issue was fully litigated.  The other addresses the rights of Commonwealth when a settlement of the litigation has been reached.

### Condition 9(b)

Condition 9(b) applies if there is a final determination by a court of competent jurisdiction:

> In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been **a final determination by a court of competent jurisdiction**, and disposition of all appeals therefrom, adverse to the title as insured.

(Policy Condition 9(b) (emphasis added).)  Despite Commonwealth's contention, this provision does not apply here because a settlement occurred in lieu of a determination by the IBIA.  Also contrary to Commonwealth's contention, this section does not give Commonwealth a right to a final determination by a court.  Commonwealth asserts that the "duty to indemnify does not arise until there has been a 'final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured.'" (Commonwealth's Response to OMG's Supplemental Brief (Docket No. 54) at 7.)  If the court were to interpret this section in the manner advocated by Commonwealth, Condition 9(c), which deals with the alternative ending of litigation through settlement, would have no meaning.  Commonwealth's reliance on Condition 9(b) is misplaced.

### Condition 9(c)

The "written consent" requirement in Condition 9(c) does apply here.  That condition

provides that:

> [t]he Company shall not be liable for loss or damage to any insured for **liability voluntarily assumed by the insured in settling any claim or suit <u>without the prior written consent</u>** of the Company.

(Policy Condition 9(c) (emphasis added).)  The court finds, however, that under the circumstances, Condition 9(c) does not bar recovery by OMG.

### 1.   *Written Consent*

"Written consent" is not defined in the Policy.  The term is ambiguous, so the court construes it in favor of OMG, the insured.  <u>United States Fid. & Guar. Co. v. Sandt</u>, 854 P.2d 519, 523 (Utah 1993).  The series of written communications between the parties establish an implied, if not express, acceptance of OMG's decision to settle and vacate the premises.  The interpretation advocated by Commonwealth (i.e., that OMG failed to comply because it did not present the proposed final settlement agreement and because it did not receive an uncontroverted response giving Commonwealth's blessing of the final terms) is too narrow.  When interpreting an insurance policy, the court must strictly construe the policy in favor of the insured.  <u>Id.</u>

The court finds that Commonwealth provided written consent to the settlement in its August 2005 letter to OMG, in which it stated, "We understand generally that the insured expects to dismiss the appeal at the end of the year, that it has made a decision to vacate the subject premises and is in the process of negotiating remediation or contamination agreements with the Tribe."  (Aug. 24, 2005 Letter from Commonwealth to OMG at 2.)  Commonwealth was aware throughout the appeal that OMG was in the process of settling the claims and had decided to shut down its operations and leave the property.  Its written recognition of this strategy is sufficient to constitute written consent.

20

2.     *Estoppel*

Even if the correspondence between the parties does not amount to written consent,
Commonwealth is estopped from strictly enforcing the requirements of Condition 9(c).  Although
estoppel cannot be used to create coverage, if there is prejudice to the insured based on the
insured's actions, the doctrine bars an insurance company from declining coverage on technical
grounds.  See Couch on Insurance 3d §§ 101:8 - 101:9.  Commonwealth had sufficient notice of
OMG's litigation strategy and settlement plans, as demonstrated by the correspondence between
the two parties.  Commonwealth expressly acknowledged that OMG did not waive its right to
claim indemnification.  Throughout the appeal and settlement negotiations, Commonwealth
never objected.  In fact, its actions suggest that it concurred with OMG's decision.  It may not
now rely on a strict interpretation of Condition 9(c) to foreclose recovery by OMG.

3.     *No Actual Prejudice*

Even assuming that OMG breached the written consent provision, under the facts of this
case and under Utah law, the breach was not material and so did not relieve Commonwealth of
its obligation to pay OMG's claim.  Under Utah law, "[c]onsent to settle exclusions . . . are
intended to protect an insurer's subrogation rights against a tortfeasor."  State Farm Mut. Auto.
Ins. Co. v. Green, 89 P.3d 97, 101 (Utah 2003).  In other words, a central purpose of such a
clause is to protect the insurer from collusive settlements between the insured and a third party.
Rupp v. Transcontinental Ins. Co., 627 F. Supp. 2d 1304, 1323 (D. Utah 2008).

To enforce the written consent clause, Commonwealth must show that OMG's breach of
the provision was material (an immaterial breach does not void coverage).  State Farm, 89 P.3d at
103.  A breach is material only if the insurer can prove that it was actually prejudiced by the

settlement.  Id. at 104.  "The actual prejudice rule strikes an appropriate balance between protecting an insurer's interests and avoiding forfeiture of coverage when an insurer has not been harmed."  Id.  Commonwealth may establish actual prejudice and deny coverage only if it had a realistic possibility of getting the original Lease reinstated through successful litigation at the IBIA.  See id.

Commonwealth contends that it was prejudiced because it did not have the opportunity to evaluate the actual proposed settlement papers before the litigants signed and submitted them to the IBIA and because it did not know that OMG was going to request indemnification after settling the appeal, abandoning its operations, and leaving the property.  The court disagrees.

First, OMG expressly reserved its right to seek indemnification in the event the appeal was unsuccessful.  Second, Commonwealth was sufficiently informed about the fact of the appeal, the nature of the appeal, the nature of the negotiations occurring during the appeal, the general nature of the settlement plans, and OMG's plan to dismiss the appeal, shut down the operations and facility, and terminate the Lease.  In an October 27, 2005 letter to Commonwealth, OMG said that its "ultimate objective is to file a stipulation with the BIA and Shivwits band, dismissing the appeal and releasing OMG from all related future claims."  (Ex. Z to OMG's Mem. Supp.)

Commonwealth never objected to the proceedings despite its full knowledge of the appeal and negotiations.  Commonwealth received all of the briefs filed with the IBIA.  It paid all of the attorneys' fees after carefully reviewing each billing statement.

It also had plenty of opportunities to object to the planned settlement.  Yet it said nothing to discourage the settlement, much less prohibit approval of the settlement.  For example, after

OMG forwarded to Commonwealth the September 2006 Stipulation for Dismissal with Prejudice, the Final Settlement Agreement, and its final defense cost bills, Commonwealth paid the bills.

Commonwealth also contends that it was prejudiced because it lost its right to take the appeal to its final conclusion and receive a judgment by a court of competent jurisdiction.  As the court discussed above, the Policy did not give Commonwealth a right to have the dispute fully litigated.  Also, the strength of the BIA's litigation stance suggests that pursuing the appeal to a final conclusion would have been futile.

Under the circumstances, Commonwealth was not actually prejudiced by OMG's settlement with the BIA and so it may not use Condition 9(b) as a bar to OMG's recovery.

## **ORDER**

For the reasons set forth above, OMG's Motion for Partial Summary Judgment (Docket No. 29) is GRANTED and Commonwealth's Motion for Summary Judgment (Docket No. 32) is DENIED.

DATED this 12th day of October, 2012.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge